## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| WILVER CATARINO and KENIA SORIANO, as Surviving Children of Felix Catarino, Deceased, and Wilver Catarino on behalf of THE ESTATE OF FELIX CATARINO, | * * * * * | |
| | * | |
| Plaintiffs, | * | CIVIL ACTION FILE NO. |
| v. | * | 2:24-CV-0024-RWS |
| | * | |
| BANKS COUNTY SHERIFF CARLTON SPEED and SGT. JEFFERY LEDFORD, | * * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

COME NOW Plaintiffs Wilver Catarino and Kenia Soriano and hereby file this Complaint against Defendants as follows:

### INTRODUCTION

1.

This is a 42 U.S.C. §1983 action brought under the Fourth Amendment to the United States Constitution arising from Sgt. Ledford's objectively unreasonable use of deadly force against Plaintiffs' father Felix Catarino. Plaintiffs also assert a Section 1983 supervisory liability claim against Sheriff Speed for failure to properly evaluate Sgt. Ledford's fitness for duty after another shooting just six weeks earlier, from

which a jury could infer deliberate indifference to constitutional rights because it was foreseeable that Ledford could overreact to a situation and shoot someone without justification if not appropriately cleared by a qualified mental health professional after the traumatic experience of the prior incident, as well as for otherwise being deliberately indifferent to Ledford's mental health issues, constitutional rights in general, and the foreseeable consequences of such indifference. Both Defendants are sued in their individual capacity for their personal participation in either using or causing the use of excessive force in violation of clearly established law and generally accepted law enforcement practices. Plaintiffs also assert pendent state law claims of negligence, battery, and wrongful death against Defendant Ledford for using more force than authorized by Georgia's self-defense statute, for which he has no official immunity because he acted with actual malice by willfully using deadly force under circumstances where it was not necessary for the protection of human life.

## JURISDICTION AND VENUE

### 2.

This action is brought pursuant to 42 U.S.C. §§1983 and 1988, 42 U.S.C. §1201 *et seq,* 29 U.S.C. §794, and the Fourth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343, and the aforementioned constitutional and statutory provisions. Plaintiffs further invoke the

pendent or supplemental jurisdiction of this Court to decide state law claims under 28 U.S.C. §1367 and diversity jurisdiction under 28 U.S.C. §1332.

3.

Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and N.D.L.R. 3.1B(3) because the event giving rise to this claim occurred in Banks County, Georgia, which is situated within the district and divisional boundaries of the Gainesville Division of the Northern District of Georgia, and because one or more of the parties reside within said district and division.

4.

All the parties herein are subject to the jurisdiction of this Court.

**PARTIES**

5.

Plaintiffs Wilver Catarino and Kenia Soriano Laura Leah King are citizens of North Carolina and the surviving adult children of Felix Catarino, who died an untimely death at the age of 62 on March 23, 2022.  Felix was divorced at the time of his death and had no other children, so Wilver and Kenia are authorized by Georgia law to bring this action for his wrongful death.

6.

Plaintiff Wilver Catarino has petitioned the Probate Court of Banks County to

appoint himself as administrator his father's estate, and once Letters of Administration are issued the Complaint will be amended to add a claim on behalf of the estate for pain and suffering, funeral or other necessary expenses, and punitive damages.

7.

Defendant Carlton Speed is the duly elected and sworn Sheriff of Banks County, Georgia who is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class Mail sent to him at the Banks County Sheriff's Office, 160 Windmill Farm Road, Homer, Georgia 30547.

8.

Defendant Sergeant Jeffery Ledford is a deputy sheriff employed by Sheriff Speed who acted within the scope of his employment at all times relevant herein, who is subject to the jurisdiction of this Court, and who may be served with process by request for waiver of service by First Class Mail sent care of the Banks County Sheriff's Office, 160 Windmill Farm Road, Homer, Georgia 30547.

9.

At all times relevant herein, Defendants acted under color of state law.

**FACTUAL ALLEGATIONS**

10.

On March 23, 2022, Felix Catarino took a taxicab to various locations around

Commerce, Georgia – including his bank and the Social Security office – and by the time he completed his errands and was driven home at the end of the trip, he was told that he owed a $330.00 cab fare.

11.

When the cab dropped Felix off at his residence – a mobile home owned by his son Wilver at 155 Hebron Court in Commerce – he told the driver that he did not have the money to pay him today but showed him an ATM card and told him that he would be able to get the money tomorrow after a deposit cleared.

12.

The entire conversation between Felix and the driver took place in Spanish.

13.

In addition to having a limited comprehension of the English language, Felix was diagnosed with schizophrenia and behaved as if he were mentally imbalanced.

14.

Because the cab driver did not know Felix and could not trust him to pay later, he called 911 for police assistance.

15.

Both Felix and the cab driver waited patiently in Felix's front yard for the police to arrive.

16.

The responding officer was Sergeant Ledford, who asked the driver if he was willing to wait on payment. When the driver told him he needed to be paid today, Ledford told Felix that he would be arrested for theft of services if he could not come up with the money.

17.

At some point Felix did call one or more family members from his cell phone to see if someone could bring him the money, but he was unsuccessful in that effort.

18.

Once it became clear that he would not be able to pay his fare, Ledford decided to arrest him.

19.

Ledford told Felix that he was under arrest and began giving commands to Felix in English, but it was not clear that Felix understood everything that Ledford was saying.

20.

When Felix began reaching around in a duffel bag he was carrying, Ledford gave him repeated commands to put down the bag, but Felix did not respond immediately.

21.

Felix eventually did put the bag on the ground, but he continued to rummage through it until he pulled out a piece of hollow metal pipe approximately 20 inches long and 1 inch in diameter.

22.

While Felix never swung the pipe at anyone, he nonetheless held it in his hand and began to walk toward Ledford as Ledford commanded him to drop it.

23.

When Felix pulled the pipe out of his bag, he was approximately ten feet away from Ledford.

24.

As Felix stepped toward Ledford, Ledford stepped backward to maintain distance between them.

25.

Ledford pulled out his Taser and repeatedly told Felix to "stop" or he would be tased, but it is not clear that Felix understood the commands or what it meant to be tased.

26.

As Felix was walking toward him with the pipe in his hand, Ledford would

have been justified in using the Taser he had already drawn, as well as a baton, pepper spray, hard hand tactics, or other less lethal forms of force to gain control and complete the arrest, but no reasonably trained officer would have believed that he was authorized to use deadly force under the circumstances.

27.

Having already drawn his Taser and received extensive Taser training, a reasonable officer in Ledford's position would have used the Taser in accordance with that training.

28.

Taser training materials contain several illustrations on how to respond to a suspect holding a club or other blunt weapon without resorting to the use of deadly force.  The graphics on the following pages are copied directly from the training materials used by the Taser manufacturer, whose product manuals are the exclusive source used by law enforcement agencies in the training and certification of all law enforcement officers in the proper use of a Taser before they are allowed to carry one. The two illustrations at the top of the next page demonstrate how Taser-certified officers are expected to respond to an approaching suspect who is not only wielding a hammer but is raising it to use as a weapon:



29.

The following excerpt from the Taser training manual illustrates the proper use of a Taser to stop a suspect carrying a solid metal crowbar:



30.

The following Taser training slide shows the use of a Taser against a suspect

brandishing a baseball bat:



ducted Electrical Weapons (CEWs) are designed to use propelled
s or direct contact to conduct electrical charge to primarily affect
r functions and/or the sensory nervous system.

X26 is a software upgradable CEW manufactured by Axon
orise, Inc.

31.

But rather than following his training and using the Taser which he was already

holding in his hand, Ledford made a series of unreasonable decisions to reholster his

Taser, draw his pistol, and pull the trigger four (4) times to shoot and kill Felix

without any warning that deadly force would be used.

32.

Under the totality of the circumstances, no  reasonable officer in Ledford's position would have reasonably believed there was justification for the  use of deadly force against Felix Catarino at the time it was used.

33.

In addition to ending the life of a mentally ill person who did not pose an imminent lethal threat, firing four bullets in a densely populated trailer park at a 62-year-old man who spoke little English and was unable to pay his cab fare also posed an unreasonable threat to the neighbors.

**THEORIES OF RECOVERY**

**<u>COUNT I – FOURTH AMENDMENT CLAIM
AGAINST DEFENDANT LEDFORD
IN HIS INDIVIDUAL CAPACITY</u>**

34.

The aforementioned misconduct of Defendant Ledford in using deadly force against Felix Catarino under circumstances where a jury could find it was objectively unreasonable to do so was a violation of the Fourth Amendment of the United States Constitution.

35.

In March 2022, a reasonable police officer would have known that it was unconstitutional to use deadly force against someone who was in possession of a weapon but was not using in a manner which posed an immediate lethal threat. *See, e.g.*, *Weiland v. Palm Beach Cty. Sheriff's Office,* 792 F.3d 1313, 1326-27 (11th Cir. 2015) (shotgun in lap of man with bipolar disorder); *Turk v. Bergman*, 685 F. App'x 785, 788–89 (11th Cir. 2017) (gun lying on car seat next to driver); *Mercado v. City of Orlando*, 407 F.3d 1152, 1154, 1158 (11th Cir. 2005) (suicidal person holding knife who ignored commands to drop the knife but made no threatening moves); *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir. 1985) *(en banc)* (resisting suspect lunged for officer's gun but did not gain control of it).

36.

The law being clearly established in March 2022 that mere possession of a weapon does not justify the use of deadly force unless and until the weapon is raised in such a way as to pose an immediate threat of death or serious injury, Defendant Ledford is not entitled to qualified immunity and is thus liable for damages in his individual capacity.

## COUNT II – SUPERVISORY LIABILITY CLAIM AGAINST
## SHERIFF SPEED IN HIS INDIVIDUAL CAPACITY

37.

Prior to the subject incident, Defendant Ledford was involved in another shooting where he fired his weapon in the line of duty on February 8, 2022.

38.

During that incident, shots were also fired by the suspect, and gunshot injuries were sustained by the suspect, a fellow officer, and an alleged kidnapping victim who was sleeping in a stolen car with her alleged kidnapper in a motel parking lot when the officers approached them.

39.

Despite the fact that multiple shots injuring 3 people were fired by multiple individuals, the suspect was tried and convicted of aggravated assault just 2 months after the shooting without the benefit of expert testimony or ballistics analysis as to which bullets were fired by which weapons, suggesting the possibility that Ledford may have shot all three victims – a possibility that was concealed from the jury as part of a cover-up of inconvenient details in which Sheriff Speed was either a knowing or unknowing participant.  To the extent he knowingly participated in the cover-up, Speed acted or failed to act with deliberate indifference to constitutional rights.

40.

While the precise details of that incident are presently unknown, it is clear that anyone involved in an exchange of gunfire between law enforcement and a criminal resulting in multiple gunshot victims would have gone through what anyone would consider a traumatizing experience, and as Ledford's employer and a law enforcement professional, Sheriff Carlton Speed knew that.

41.

As sheriff, Defendant Speed also knew that generally accepted law enforcement standards – including written standards adopted by the Department of Justice and the International Association of Chiefs of Police – require that any officer involved in a shooting incident, whether justified or otherwise, be placed on administrative leave and undergo counseling and evaluation by a qualified mental health professional before being cleared for return to duty.

42.

Upon information and belief, Defendant Ledford was allowed to return to duty after the February 8 shooting without first receiving the required evaluation and clearance, which made it more likely that he would overreact in a future confrontation with a noncompliant suspect and prematurely resort to the use of deadly force than would have been the case had he been properly evaluated and not returned to duty

until his readiness was certified by a qualified professional.

43.

Sheriff Speed's failure to follow the aforementioned standards and to ensure that someone under his command was properly evaluated and cleared for return to duty amounted to deliberate indifference to the constitutional rights of Felix Catarino and anyone else who might come into contact with Sgt. Ledford before he could be entrusted to carry a firearm again.

44.

In addition to his deliberate indifference in failing to ascertain Sgt. Ledford's fitness for duty after the shooting six weeks earlier, Sheriff Speed was also deliberately indifferent to Ledford's mental health status in general, as demonstrated by the following facts and reasonable inferences that may be drawn therefrom:

a)  When Ledford was hired by Speed as a deputy sheriff, he was administered a standard psychological test required of all applicants, but his test sheet was never forwarded to the testing service to be scored and summarized by an interpretive report, and he was sworn as a deputy without the regard for the test results or lack thereof;

b)  Despite having never been properly evaluated for mental fitness, Ledford was promoted from the rank of Deputy to Corporal in just 6 weeks, and

from Corporal to Sergeant in less than 7 months;

c)      Throughout his period of employment with the Sheriff's Office, his co-workers commented about Ledford's mental abnormalities and Speed was aware of such comments, but he failed to take steps to have Ledford's mental health properly evaluated;

d)      During his employment with the Sheriff's Office, supervisors and dispatchers would triage Ledford's calls and would avoid sending him into stressful situations that could potentially trigger his mental health issues, and apparently they did not anticipate that he would have trouble dealing with a cab driver who had been stiffed out of a fare;

e)      Ledford admitted to his co-workers that he had mental health issues starting in childhood, including obsessive-compulsive personality disorder and a condition commonly known as "germaphobia" which prevented him from going hands-on with suspects and likely explained his failure to administer any first aid to Mr. Catarino after shooting him, and these mental health issues were a matter of general knowledge and gossip within the department which Speed was aware of throughout Ledford's employment;

f)      Ledford eventually resigned from his position and was forthright about his mental health issues, including his distrust of doctors and unwillingness

to undergo mental health evaluation and treatment, which had been ongoing throughout his tenure with the Sheriff's Office as part of a known pattern of conduct that predated the shooting of Mr. Catarino; and

g)     Reasonable jurors, with the aid of expert testimony, could infer from Ledford's continuing pattern of conduct and statements before, during, and after the time of the subject incident that he was mentally unfit for duty, that he should not have been employed in a position where he was foreseeably able to overreact to a situation and end someone's life, and that the only reason he was in that position was due to the deliberate indifference of Sheriff Speed.

45.

Sheriff Speed is subject to supervisory liability under Section 1983 in his individual capacity because his deliberate indifference to constitutional rights, law enforcement standards, and the safety of the public made it foreseeable that Sgt. Ledford would violate the Fourth Amendment rights of Felix Catarino or another member of the public.

## COUNT III – PENDENT STATE LAW CLAIMS AGAINST DEFENDANT LEDFORD ONLY

46.

By using deadly force against Felix Catarino under circumstances where it was

not necessary for the defense of self or others under O.C.G.A. §16-3-21, Defendant Ledford committed an actionable battery under Georgia law.

47.

The unreasonable decision by Defendant Ledford to use deadly force against Catarino was a breach of the standard of care applicable to the law enforcement profession as well as to the public at large under O.C.G.A. §§16-3-21 and 51-1-1 *et seq.*, and such failure to comply with the standard of care constituted a breach of duty actionable as negligence under Georgia law.

48.

Defendant Ledford is not entitled to official immunity under Georgia law because he acted with actual malice in that he willfully committed a wrongful act with intent to cause injury by using unreasonable and unnecessary force.

**DAMAGES**

49.

As a direct and proximate result of the conduct of Defendants, Felix Catarino was deprived of his legal rights as well as his life, and Defendants are liable for all damages proximately flowing from said deprivation of rights, including but not limited to the full value of decedent's life, both economic and noneconomic.

50.

Once an administrator has been appointed by the Probate Court and the Complaint is amended accordingly, Defendants will also be liable to the Estate of Felix Catarino for his conscious pain and suffering, including mental anguish and emotional distress, and his final medical and funeral expenses, all of which were proximately caused by Defendants unlawful and tortious conduct, as well as for punitive damages against Defendants for their willful and wanton acts.

51.

Defendants are liable to Plaintiffs for all the foregoing injuries and damages in an amount to be proven at trial and determined by the enlightened conscience of fair and impartial jurors.

52.

Plaintiffs are entitled to recover reasonable attorney's fees and expenses of litigation pursuant to 28 U.S.C. §1988 and other applicable law.

**WHEREFORE**, Plaintiffs demand the following:

a)      That this action be tried by a jury;

b)      That judgment be entered in favor of Plaintiffs and against Defendants in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c)      That Plaintiffs be awarded attorney's fees and reasonable expenses of

        litigation;

d)      That all costs of this action be taxed against Defendants; and

e)      That the Court award any additional or alternative relief as may be

        deemed appropriate under the circumstances.

A JURY TRIAL IS DEMANDED.

Respectfully submitted this 5th day of February, 2024.


                                        */s/ Craig T. Jones*
                                        _____
                                        CRAIG T. JONES
                                        Ga. Bar No. 399476
                                        Counsel for Plaintiffs

CRAIG T. JONES, P.C.
Post Office 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com